FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Nov 22, 2016

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| WILD FISH CONSERVANCY,<br><br>                    Plaintiff,<br><br>        v.<br><br>DAVE IRVING, in his official capacity as the Manager of the Leavenworth Fisheries Complex; UNITED STATES FISH AND WILDLIFE SERVICE; DANIEL M. ASHE, in his official capacity as the Director of the United States Fish and Wildlife Service; UNITED STATES BUREAU OF RECLAMATION; LOWELL PIMLEY, in his official capacity as the Acting Commissioner of the United States Bureau of Reclamation,<br><br>                    Defendants. | No.   2:14-CV-0306-SMJ<br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |

## I.    INTRODUCTION

This case concerns the U.S. Fish and Wildlife Services' (FWS) and Bureau of Reclamation's (BOR) operation and management of the Leavenworth National Fish Hatchery (the Hatchery). As required by the Endangered Species Act (ESA), FWS and BOR engaged in consultation with the National Marine Fisheries Service (NMFS) concerning the effects of the Hatchery's operation on endangered

SUMMARY JUDGMENT ORDER - 1

Chinook salmon and steelhead in Icicle Creek, and NMFS issued a Biological Opinion (BiOp) and Incidental Take Statement (ITS). Wild Fish Conservancy (the Conservancy) alleges NMFS's BiOp and ITS are arbitrary, capricious, an abuse of discretion, and not in accordance with the law; that NMFS violated the National Environmental Policy Act (NEPA) by failing to prepare an Environmental Impact Statement (EIS); and that, in relying on the BiOp, BOR and FWS violated the ESA by failing to insure that Hatchery operations will not jeopardize listed species.

As will be discussed below, the BiOp is arbitrary and capricious on one narrow basis—NMFS failed to adequately consider the effects of climate change in its analysis of the Hatchery's operations and water use. The remainder of the Conservancy's arguments fail: the BiOp and ITS are not arbitrary and capricious on any other alleged basis, NMFS had no obligation to conduct an EIS in connection with its preparation of the ITS, and the BOR and FWS satisfied their obligations under Section 7 of the ESA by relying on the BiOp and ITS. Accordingly, Plaintiff's motion for summary judgment is granted with respect only to whether the BiOp was arbitrary and capricious and denied with respect to all other claims. Defendant's motions for summary judgment are denied in part and granted in part on the same basis.

## II.    BACKGROUND

### A.    The Endangered Species Act

Congress passed the ESA in 1973. Its stated purposes were "'to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved,' and 'to provide a program for the conservation of such . . . species . . . .'" *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978) (quoting 16 U.S.C. § 1531(b)). The Secretaries of the Department of the Interior and Department of Commerce are charged with implementing the ESA and have delegated those responsibilities to FWS and NMFS, respectively. Generally, FWS has ESA authority for terrestrial and freshwater species and NMFS has authority for marine and anadromous species. *See* 50 C.F.R. §§ 17.2, 17.11, 223.102, 224.101.

Section 4 of the ESA establishes the mechanisms for listing threatened and endangered species and for designating "critical habitat." 16 U.S.C. §§ 1532(16), 1533(a). Section 9 makes it unlawful to "take" ESA listed species. 16 U.S.C. § 1538(a)(1)(B). "Take" is defined to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532. The term harm includes any act "which actually kills or injures fish or wildlife," including, as relevant here, "significant habitat modification or degradation which actually kills or injures fish . . . by significantly impairing

essential behavioral patterns, including breeding, spawning, rearing, migration, feeding or sheltering." 50 C.F.R. § 222.102.

Section 7 of the ESA imposes a substantive obligation on federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [the critical] habitat of such species." 16 U.S.C. § 1536(a)(2). Section 7 requires that any federal agency planning any action (the action agency) that may affect ESA-listed species must consult with NMFS or FWS (the consulting agency). 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). At the conclusion of consultation, the consulting agency must issue a Biological Opinion (BiOp). *Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985), *overruled on other grounds by Cottonwood Envtl. Law Ctr. v. United States Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015).

The BiOp provides the consulting agency's opinion concerning whether the proposed action is likely to jeopardize the ESA-listed species or adversely modify critical habitat, and it must be based on "the best scientific and commercial data available." 50 C.F.R. § 402.14(g)(8), (h)(2)–(3). If the BiOp concludes that jeopardy or adverse modification is likely, the BiOp must describe reasonable and prudent alternatives, if available, that would avoid such an outcome. 16 U.S.C. §

1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). If the BiOp concludes that jeopardy or adverse modification are not likely, or that reasonable and prudent alternatives will avoid jeopardy or adverse modification, the consulting agency must issue an incidental take statement (ITS). 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

The ITS must state the anticipated level of incidental take that will result from the proposed action, set terms and conditions to minimize impacts to listed species, and set monitoring and reporting requirements. 16 U.S.C. § 1536(b)(4)(C)(i)–(ii), (iv); 50 C.F.R. §§ 402.14(i)(1)(i)–(ii), (iv), 402.14(i)(3). Take in compliance with an ITS is exempt from liability under Section 9 of the ESA. 16 U.S.C. § 1536(o)(2).

**B.    Summary of Facts**

**1.    Icicle Creek and ESA-listed Chinook and Steelhead**

Icicle Creek originates in the Cascade Mountains and flows into the Wenatchee River at the City of Leavenworth. NMFS 11987. Its watershed covers approximately 214 square miles. NMFS 45787. Icicle Creek is home to two ESA listed species that are at issue in this case: the Upper Columbia River spring Chinook evolutionarily significant unit, (*Oncorynchus tshawytscha*) listed in 1999, 64 Fed. Reg. 14,308 (March 24, 1999), and the Upper Columbia River

steelhead[1] distinct population segment (*Oncorhynchus mykiss*), which was listed in 1997, 62 Fed. Reg. 43,937 (Aug. 18, 1997). Upper Columbia steelhead were downgraded to a threatened species in 2006. 71 Fed. Reg. 834 (Jan. 5, 2006). Icicle Creek is not included in the designated critical habitat for Upper Columbia River Spring Chinook. NMFS 11980. Icicle Creek is designated as critical habitat for Upper Columbia River steelhead. 70 Fed. Reg. 52,630 (Sept. 2, 2005); NMFS 11978. A natural passage barrier prevents migration of steelhead and chinook past River Mile (RM) 5.7.[2] NMFS 24915.

NMFS's recovery plan for Upper Columbia Steelhead sets a target for the minimum number of naturally produced Steelhead reds in the Chiwawa River, Nason Creek, Icicle Creek, Peshastin Creek, and Chumstick Creek to be either 5% of the total number of reds within the Wenatchee population, or at least 20 reds, whichever is greater. NMFS 5906. The Icicle Creek steelhead population has exceeded these recovery criteria since 2008. NMFS 25932.

---

[1] Steelhead and rainbow trout are members of the same species. NMFS 12058. The difference between the populations is that steelhead are anadromous while rainbow trout are not. NMFS 12058. The fish are indistinguishable at the juvenile stage.

[2] River Miles are measured from the terminus of the stream, in this case, the confluence of Icicle Creek and the Wenatchee River. For example, the passage barrier at RM 5.7 is located 5.7 miles upstream of the point where Icicle Creek enters the Wenatchee River in Leavenworth.

SUMMARY JUDGMENT ORDER - 6

**2. The Leavenworth National Fish Hatchery**

The Leavenworth National Fish Hatchery (the Hatchery) is located on Icicle Creek about three miles south of Leavenworth, Washington. NMFS 45941. The Leavenworth National Fish Hatchery is one of several hatcheries authorized to replace spawning grounds lost when construction of the Grand Coulee Dam made the upper Columbia River basin inaccessible to anadromous fish. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 516–17 (9th Cir. 2010). FWS has managed and operated the Hatchery since its construction in 1939. *Id.* The Hatchery rears only spring chinook for harvest and is not intended to supplement or support native Chinook salmon populations. NMFS 11944. The Hatchery's spring Chinook program is listed by the Yakima Nation and FWS's anadromous fish Management Agreement as "high priority." NMFS 47206.

The Hatchery is supported by a complex water management system that includes several existing instream structures. NMFS 17528, 45956. Structure 1, located at RM 4.5 is a water intake that diverts up to 42 cubic feet per second (cfs) from Icicle Creek to supply water to the Hatchery. NMFS 45942–44. The Hatchery controls three high elevation reservoirs, which it uses to supplement surface flows in Icicle Creek with up to 50 cfs in late summer and early fall. NMFS 45945–46. The Hatchery also uses wells to draw water from a shallow aquifer. NMFS 45945–46.

A head gate known as Structure 2 regulates flow between the Hatchery Canal (a man-made channel constructed to facilitate hatchery operations) and the historical channel of Icicle Creek at RM 3.8. NMFS 11960, 45947–48. Water from the Hatchery canal returns to Icicle Creek near Structure 5, located at RM 2.8. NMFS 11960, 12063. Structure 5 consists of a bridge over Icicle Creek where racks, flashboards, or traps can be inserted to control or prevent returning hatchery fish from passing upstream. Prior to 2011, Structures 2 and 5 blocked fish passage and severely constrained stream flows into Icicle Creek between the structures. NMFS 45959. In 2011, FWS began modifying operations to allow more consistent water flow in the historic channel and to limit in-river operations of hatchery structures during steelhead migration, spawning, and rearing periods. ECF No. 68-1 at 65, 134, 173–75.

FWS and BOR engaged in consultation with NMFS from 2009 to 2015 pursuant to Section 7 of the ESA to address the Hatchery's effects on Upper Columbia River steelhead, and spring Chinook salmon. NMFS issued the final BiOp and accompanying ITS that are the subject of this case on May 29, 2015. The BiOp concluded that operation and funding of the Hatchery is not likely to jeopardize the continued existence of or result in destruction or adverse modification of critical habitat for Upper Columbia River spring Chinook salmon or steelhead. ECF No. 68 at 175–76. The BiOp identified a minimum instream

1    flow goal of 100 cfs in Icicle Creek and proposed eliminating operation of

2    Structure 2 in March if adult steelhead are present; eliminating operation of

3    Structure 2 for recharge in August; not reducing historic channel flow in

4    September when natural flows are less than 60 cfs; and, when the 100 cfs instream

5    goal is not met in dry years, maintaining instream flow goals of 40 cfs in October,

6    60 cfs from November to February, and 80 cfs in March in the Icicle Creek

7    historical channel. ECF No. 68-1 at 24–25.

8    **C.    Procedural History**

9         Plaintiff Wildfish Conservancy (the Conservancy) filed this action on

10   September 16, 2014, alleging that the Hatchery's operation causes take of listed

11   Upper Columbia River steelhead and spring-run Chinook salmon and threatened

12   bull trout, in violation of Section 9 of the ESA; failure to consult regarding

13   ongoing Hatchery maintenance and operations as required by Section 7 of the

14   ESA; failure to reinitiate consultation in light of new information; unlawful

15   commitment of resources prior to consultation; and failure to insure that Hatchery

16   operations are not likely to jeopardize ESA listed species. ECF No. 1. The

17   Defendants answered and moved to dismiss on November 17, 2014. ECF Nos. 8

18   & 9. The conservancy filed a First Amended Complaint on December 8, 2014,

19   clarifying and adding detail to the same substantive allegations. ECF No. 10. The

20   Court denied Defendants' motion to dismiss as moot on January 8, 2015. ECF No.

23. The Court granted the Confederated Tribes of the Colville Reservation's and the Confederated Tribes and Bands of the Yakama Nation's motions to intervene as defendants on February 26, 2015. ECF No. 24.

Following NMFS's issuance of the BiOp on May 29, 2015, ECF No. 68-1, the Conservancy filed a Second Amended Complaint, continuing to allege failure to insure that Hatchery operations will not jeopardize listed species, and also alleging that the BiOp was arbitrary, capricious, an abuse of discretion, and not in accordance with the law and that NMFS violated NEPA by failing to prepare an Environmental Impact Statement. ECF No. 77.

The Conservancy moved for Summary Judgment. ECF No. 92. Defendant Confederated Tribes and Bands of the Yakama Nation (the Yakama Nation), Defendant Confederated Tribes of the Colville Reservation (the Colville Tribes), and the Federal Defendants each separately filed cross-motions for summary judgment. ECF Nos. 97, 98, &100.

### III.    STANDARD OF REVIEW

The adequacy of BiOps under the ESA and an agency's compliance with NEPA are reviewed under the Administrative Procedures Act (APA). *Bennett v. Spear*, 520 U.S. 154, 174–79 (1997) (holding that ESA claims not reviewable under the ESA's citizen-suit provision, including challenges to the adequacy of a BiOp, may be reviewed under the APA); *W. Watersheds Project v. Kraayenbrink*,

632 F.3d 472, 481 (9th Cir. 2010) ("Alleged procedural violations of NEPA . . . are reviewed under the [APA].").

Under the APA, the court may set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The court "must uphold agency decisions so long as the agencies have 'considered the relevant factors and articulated a rational connection between the factors found and the choices made." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004) (quoting *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 953–54 (9th Cir.2003)). "A reviewing court 'generally must be at its most deferential when reviewing scientific judgments and technical analyses within the agency's expertise." *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 846 (9th Cir. 2013).

# IV.    DISCUSSION

**A.    The BiOp issued by NMFS on May 29, 2015 is arbitrary and capricious.**

The Conservancy argues that the 2015 BiOp is arbitrary and not in accordance with the law because (1) NMFS's evaluation the Hatchery's water diversions impermissibly relies on uncertain future improvements and fails to adequately account for climate change, and (2) the ITS does not establish clear standards and procedures for monitoring and evaluating harm caused by the Hachery's operations. ECF No. 92 at 18. The Conservancy's arguments fail except with respect to one narrow, but dispositive issue. NMFS failed to adequately consider the effects of climate change in the BiOp's analysis of the Hatchery's operations and water use. Because NMFS failed to consider this important factor, the BiOp is arbitrary and capricious.

**1.    NMFS did not rely on uncertain future mitigation measures.**

NMFS may not rely on proposed future improvements in its analysis unless there are "solid guarantees" the improvements will actually occur. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935 (9th Cir. 2007). This must include "specific and binding plans" and "a clear, definite commitment of resources for future improvements." *Id.* at 935–36. Additionally, an "agency must consider near-term habitat loss to populations with short life cycles." *Pac. Coast Fed'n of Fishermen's Ass'n v. U.S. Bureau of Reclamation*, 426 F.3d 1082,

1095 (9th Cir. 2005). And the agency must therefore discount the benefit of future improvements in its jeopardy analysis if multiple generational cycles may occur before the improvements will be made. *See id.* ("It is not enough to provide water for the [species] to survive in five years, if in the meantime, the population has been weakened or destroyed by inadequate water flows.").

NMFS expressly did not rely on FWS's long-term commitments made as part of the consultation process. Specifically, the BiOp states that NMFS did "not rely on implementation of these long term actions for [its] jeopardy and critical habitat analyses. . . . [C]onsidering the uncertainty of implementation of the long-term actions, NMFS considered that ongoing operations would continue into the future under the proposed flow regime." ECF No. 68-1 at 143-44. The Conservancy argues that, contrary to NMFS's statement, the record demonstrates that NMFS did consider the proposed long-term actions. ECF No. 92 at 24–27.

As the Conservancy points out, a draft BiOp issued in April 2015 found that Hatchery operations adversely modified steelhead critical habitat and proposed alternatives requiring the Hatchery to operate diversions at Structures 1, 2, and 5 to avoid causing instream flows to fall below levels identified as necessary for steelhead rearing and adult passage: 150 cfs year-round at Structures 1, 2, and 5 for juvenile rearing, and 200 cfs between March and June for adult passage at Structure 5. NMFS 9735. FWS objected to this requirement, on the basis that it

1    would not be able to meet the goals in all years given existing Hatchery facilities.

2    NMFS 9819–29. In May 2015, FWS agreed to implement water saving

3    technologies within eight years to insure a minimum in-stream flow of 100 cfs at

4    all times.  ECF No. 92 at 22.

5            On May 20, 2015, NMFS issued a revised draft BiOp that concluded the

6    Hatchery operations were not likely to adversely modify critical habitat, relying in

7    part on FWS's commitment to stop diverting water at Structure 2 within 8 years.

8    NMFS 10705–06. A week later, however, the final BiOp explained that NMFS

9    analysis did not rely on FWS's uncertain long-term commitments. NMFS 12070–

10   71.

11           These circumstances, taken alone, could suggest that NMFS improperly

12   relied on future, uncertain changes. However, the analysis in the BiOp considers

13   only the immediate Hatchery operations. ECF No. 68-1 at 98-169. Importantly,

14   NMFS did not analyze the potential water savings from changes proposed in the

15   longer-term plan. 2015 BiOp at 143. Additionally, the BiOp recommends

16   immediate implementation of several actions necessary to avoid jeopardy,

17   including: (1) Structure 2 will not be closed in March if steelhead are present; (2)

18   if Structure 2 is closed during spring Chinook broodstock collection, traps at

19   Structure 5 will be monitored twice daily and steelhead transported and released

20   above structure 5; (3) Structure 2 operation in August, an offset from two

1    reservoirs in dry years where operation of Structure 2 is necessary for aquifer

2    recharge; and adoption of approved fish salvage methods for identifying and

3    removing fish entrained in the water intake system. ECF No. 68 at 25.

4         The analysis in the BiOp does not improperly consider uncertain, long-term

5    proposals, and there is no basis for the court to reject the BiOp on this basis.

6    **2.    NMFS failed to adequately considered climate change in
             analyzing the effects of the Hatchery's operations and water use.**

7    The BiOp includes a detailed discussion of the effects of climate change on

8    salmonid recovery in the Pacific Northwest, including that models predict a

9    significant reduction in total snowpack and low-elevation snowpack, affecting

10   streamflow and water temperatures. ECF No 68-1 at 38, 58–59.  Despite these

11   predicted changes, NMFS used historical stream-flow data from 1994 to 2014 in

12   the analysis of the Hatchery's operations and water use. ECF No. 68-1 at 142,

13   144–58, NMFS 12069–70. The Conservancy argues that by doing so, NMFS

14   failed to consider an important factor. ECF No. 92 at 29. Defendants argue that

15   NMFS properly considered the best available science concerning the region-wide

16   effects of climate change and relied on only historical averages to conduct its

17   analysis of Icicle Creek stream flows because no finer-scale climate change

18   analysis of Icicle Creek was available for NMFS to consider. ECF No. 98 at 8–12;

19   ECF No. 100 at 27. Defendants further argue that the Court should defer to

20   NMFS's highly technical determination of this matter. ECF No. 97 at 22.

SUMMARY JUDGMENT ORDER - 15

First, it is important to note that while the Court must give deference to the expert agency on highly scientific or technical questions, *see Nat'l Wildlife Fed'n v. ACOE*, 384 F.3d 1163, 1174 (9th Cir. 2004), a voluminous and technical record does not insulate a decision from judicial review under that deferential standard. The Court is obligated to carefully review the agency's decision even if it is complex and technical.

Defendants are correct that the agency is not required "to conduct new tests or make decisions on data that does not yet exist." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (2014). Defendants' arguments that NMFS did not need to consider climate change in its analysis nevertheless miss the mark here. The best available science indicates that climate change will affect stream flow and water conditions throughout the Northwest. ECF No. 68-1 at 58–59. The fact that there is no model or study specifically addressing the effects of climate change on Icicle Creek does not permit the agency to ignore this factor.

The problem with NMFS's analysis is not that it used recent historical streamflow data to model the effects of hatchery operations and water use at different flow levels. *See* ECF No. 68-1 at 142, 144–58. The problem here is that NMFS included no discussion whatsoever of the potential effects of climate change in the BiOp's analysis of the Hatchery's future operations and water use. NMFS discusses the effects of climate change generally and then proceeds with

analysis on the apparent assumption that there will be no change to the hydrology of Icicle Creek. NMFS does not necessarily need to conduct a study or build a model addressing the impacts of climate change on the Icicle Creek watershed. But its analysis must consider that the best available science, which it discusses elsewhere in the BiOp, suggests that baseline historical flow averages may not be effective predictors of future flows.

Defendants point out that NMFS did conclude that climate change is less likely to affect Icicle Creek than other parts of the Pacific Northwest. ECF Nos. 98 at 8, 100 at 28. In context, the BiOp states that "climate change is likely to warm and change the hydrology of the entire critical habitat for [Upper Columbia Steelhead]," and notes that the effects of climate change "increase[] the importance of restoring habitat in Icicle Creek, an area that will be less prone to climate change affects. [sic]" ECF No. 68-1 at 175. However, this statement is conclusory and unconnected to the analysis of the Hatchery's operations and water use. And in any case, the fact that Icicle Creek may be less prone to the effects of climate change does not mean that there will be no changes.

Because NMFS failed to consider the potential effects of climate change on stream flows in Icicle Creek in connection with its analysis of the effects of the Hatchery's operations and water use on listed salmonids and critical habitat, NMFS failed to consider an important aspect of the problem, and the BiOp is

1   arbitrary and capricious. It is, of course, not the Court's place to tell the agency

2   *how* to do consider climate change in its analysis, it simply must consider it.

3       **3.    NMFS's decision to use monthly average flows was not arbitrary
            and capricious.**

4       The Conservancy argues that NMFS's use of monthly flow averages

5   improperly misrepresents potential low flows. ECF No. 92 at 31. The

6   Conservancy is correct that low flow on any given day is the critical issue because

7   "fish require sufficient flows for their survival every day." ECF No. 92 at 31. But

8   the BiOp specifically addressed this concern, and took steps to account for the

9   limitations of having only monthly data by considering other data and the

10  experience with actual operations of hatchery structures. ECF No. 68-1 at 142–47.

11  This is an area where the Court must defer to the judgment of the agency scientists

12  that monthly flow averages adequately capture the variability necessary to

13  evaluate the effects of Hatchery operations. It is not apparent that FWS's decision

14  to use monthly data relies on a faulty assumption, is counter to the evidence, or is

15  implausible. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

16      **4.    The ITS includes an adequate limit on take and monitoring
            standards.**

17      The Conservancy argues that the ITS does not meet ESA standards for take

18  because (1) it does not set an adequate trigger for take; (2) it lacks adequate

19

20

SUMMARY JUDGMENT ORDER - 18

monitoring requirements for take associated with the water intake system; and (3) because it includes contradictory provisions. ECF NO. 92 at 33–42.

The ITS "functions as a safe harbor provision immunizing persons from Section 9 liability and penalties for takings committed during activities that are otherwise lawful and in compliance with its terms and conditions." *Ariz. Cattle Growers Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1239 (9th Cir. 2001) (citing 16 U.S.C. § 1536(o)). "In general, [ITS's] set forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision, and requiring the parties to re-initiate consultation." *Id.* at 1249. The "trigger" should ideally be a number, but it may be a surrogate—"for example, changes in ecological conditions affecting the species"—but "[i]f a surrogate is used, the agency must articulate a rational connection between the surrogate and the taking of the species." *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 531 (9th Cir. 2010).

>    i.    *The ITS's trigger level is adequate.*

The ITS does not set a specific numerical level for take of Steelhead and Chinook salmon anticipated to result from the Hatchery's water diversion. Instead, the ITS uses instream flow as a surrogate as follows: (1) 100 cfs from April to July; (2) natural flows minus Structure 1 and other non-federal diversions in August (no Structure 2 operations); (3) no Hatchery caused reductions in stream

1    flows in September where flows are less than 60 cfs, and (4) minimum instream

2    flows of 40 cfs in October, 60 cfs from November to February, and 80 cfs in

3    March in dry years where Structure 1 and 2 operations cause historical channel

4    flows to drop below 100 cfs. ECF No. 68-1 at 178, 180. These surrogate levels are

5    based on flow recommendations for passage and rearing of salmonids during

6    different life cycles and at each relevant stream location. ECF No. 68-1 at 147–58,

7    178, 180. NMFS rationally connected these surrogate trigger levels to take of the

8    species.

9                    *ii.    The ITS's monitoring requirements are adequate.*

10        The Conservancy argues that the ITS lacks sufficient monitoring procedures

11   for take resulting from the Hatchery's water intake system. Specifically, the

12   Conservancy notes that the Hatchery's primary diversion structure—Structure 1—

13   does not comply with NMFS's screening criteria and entrains fish. ECF No. 92 at

14   37. Fish entrained in this diversion, travel through buried pipes and are deposited

15   in the Hatchery's sand-settling basin, where they have no way to return to the

16   creek unless manually collected and transported. ECF No. 92 at 38; NMFS

17   13725–26.

18        The BiOp acknowledges that the unscreened diversion structure kills fish,

19   and the ITS sets a take limit of 550 juvenile and 20 adult steelhead and 1,000

20   juvenile Chinook. NMFS 12104–07; ECF No. 92 at 38. The ITS sets requirements

for visual monitoring of the sand-settling basin for trapped fish. ECF No. 68-1 at 181. Additionally, FWS has specific fish salvage procedures that comply with NMFS recommended procedures. ECF No. 68-1 at 177, 179–80.

The Conservancy argues that the monitoring requirements are inadequate because it is not clear the entire sand-settling basin can be observed. ECF No. 92 at 39. Defendants, however, point out that visual monitoring is more intensive than simply standing on the edge of the pool, and includes snorkeling in the pool, which has been used effectively in the past in Icicle Creek. ECF No. 98 at 20; ECF No. 100 at 43; NMFS 12049–50. Defendants also argue that the record and BiOp adequately demonstrate that juvenile fish entrained in the pool are readily observable. ECF No. 100 at 43; ECF No. 68-1 at 132, 183.

The Court finds no basis to second-guess the scientific determination of the expert agency on this issue. The ITS includes specific terms and conditions for monitoring and removal of entrained juvenile fish. ETS No. 68-1 at 182–93. These standards were developed in consultation with FWS. NMFS 1131–32. And as the Federal Defendants point out, "NMFS was entitled to rely upon the official representations of [FWS] that it would be able to conduct the conservation and monitoring measures proposed in the action." *Or. Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 1003–04 (D. Or. 2010).

     *iii.*   *The ITS does not contain contradictory provisions.*

   The Conservancy argues that the ITS is internally contradictory with respect to the operation of Structure 2 in March. ECF No. 92 at 43. Specifically, Term 2a of the ITS requires that Structure 2 remain open in March for Steelhead spawning and migration, when more than 50 Hatchery fish migrate upstream of Structure 5. ECF No. 68-1 at 182. The ITS also provides that the Hatchery may deviate from its instream flow goal of 100 cfs for the purposes of "aquifer recharge." ECF No. 68-1 at 182. The Conservancy argues that this can only be accomplished by closing the gates at Structure 2. ECF No. 92 at 43. However, in addition to the provision of the ITS discussed by the Conservancy (Term 2a), the ITS prohibits any operation of Structure 2 in March if adult Steelhead are present in the creek (Term 2e). ECF No. 68-1 at 182. Term 2e therefore resolves any conflict within Term 2a: if adult steelhead are present in March, FWS may not operate Structure 2, even for aquifer recharge. *Id*

**D.**  **NMFS was not required to conduct an EA or EIS pursuant to NEPA when it issued the Incidental Take Statement.**

   The Conservancy argues that NMFS violated NEPA by failing to conduct an EA or EIS in conjunction with the ITS. ECF No. 92 at 44–47. NEPA requires federal agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i). If the action at issue is one that does not

1    categorically either require or not require an EIS, the agency must prepare an

2    environmental assessment (EA) to determine whether to prepare an EIS or a

3    finding of no significant impact (FONSI). *Anderson v. Evans*, 371 F.3d 475, 488

4    (9th Cir. 2002).

5         The Ninth Circuit squarely addressed this issue in *San Luis & Delta-*

6    *Mendota Water Authority v. Jewell*, holding that the implementation of the BiOp

7    and ITS is what triggers NEPA, and that responsibility lies with the action agency.

8    747 F.3d 581, 642 (9th Cir. 2014). In that case, the court considered whether

9    FWS's issuance of a BiOp was a "major federal action significantly affecting the

10   quality of the human environment.'" *Id.* (quoting 40 C.F.R. §1508.18). The court

11   distinguished the case from *Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996), where

12   NMFS issued an incidental take statement to the states of Oregon and Washington

13   pursuant to a federal-state-tribal compact (the Columbia River Fish Management

14   Plan). *Id.* at 644. In that unique circumstance, the BiOp and ITS apportioned

15   rights to parties and was "functionally equivalent to a permit." *Id.* (quoting

16   *Ramsey*, 96 F.3d at 444). By contrast, in an ordinary case, it is the action agency

17   that has the ultimate responsibility to determine whether and how to implement an

18   ITS. *Id.* The court concluded that there was "no reason to require a consulting

19   agency . . . to complete an EIS when an action agency . . . will either (1) prepare

20

an EIS when it implements [the consulting agency's] proposal or (2) reject [the consulting agency's] proposal and prepare an EIS on whatever it implements." *Id.*

*San Luis & Delta-Mendota* is dispositive. NMFS had no NEPA obligation in this case.[3]

**E.    FWS and BOR properly relied on NMFS's BiOp and ITS to satisfy their obligations under ESA Section 7.**

The Conservancy argues that FWS and BOR have violated their duty to insure that Hatchery operations do not jeopardize ESA-listed species or adversely affect their critical habitat. ECF No. 92 at 48. The conservancy argues that the agencies cannot simply rely on the BiOp because the decision to rely on the 2015 BiOp must itself not be arbitrary and capricious. ECF No. 92 at 48. An action agency has an independent duty to insure that its action is not likely to jeopardize listed species or adversely modify critical habitat. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990). The agency's decision to rely on the BiOp itself must not have been arbitrary and capricious. *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1993).

Where there are factual objections to a BiOp, an action agency's reliance on even an "admittedly weak" BiOp is generally not arbitrary or capricious. *Id.*; *Defs.*

---

[3] The parties' intend to file separate motions for summary judgment on Plaintiff's recently added claim that FWS and BOR were required to comply with NEPA and produce an EIS. The court is scheduled to hear these motions in March, 2017. ECF No. 117.

SUMMARY JUDGMENT ORDER - 24

*of Wildlife v. EPA*, 420 F.3d 946, 976 (9th Cir. 2005), *reversed on other grounds by Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007). However, an action agency may be held to account for relying on a legally insufficient BiOp. *Id.*

In this case, the BiOp, in failing to consider an important factor in its analysis, is factually, not legally, insufficient. FWS and BOR's reliance on the BiOp satisfied their duties under ESA Section 7.

## VI.    CONCLUSION

For the reasons discussed, **IT IS HEREBY ORDERED**:

1.    Plaintiff Wild Fish Conservancy's Motion for Summary Judgment **ECF No. 92**, is **GRANTED IN PART and DENIED IN PART**.

2.    Defendants' Cross-Motions for Summary Judgment, **ECF Nos. 97, 98, and 100,** are **GRANTED IN PART and DENIED IN PART**.

3.    The Biological Opinion issued by National Marine Fisheries Service is arbitrary and capricious for the reasons articulated in this opinion.

4.    Plaintiff's Fifth Cause of Action and Seventh Cause of Action are **DISMISSED**.

5.    This matter is **REMANDED** for further consultation consistent with this opinion.

1      **IT IS SO ORDERED.**   The Clerk's Office is directed to enter this Order

2   and provide copies to all counsel.

3      **DATED** this 22nd day of November 2016.

4

5                    _____
                    SALVADOR MENDOZA, JR.
                    United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

SUMMARY JUDGMENT ORDER **-** 26